**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 25-1003**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

HEROES TECHNOLOGY (US) LLC d/b/a SNUGGLE ME ORGANIC,

Petitioner,

v.

CONSUMER PRODUCT SAFETY COMMISSION,

Respondent.

_____

On Petition for Review of a Final Rule
of the Consumer Product Safety Commission

_____

**BRIEF FOR RESPONDENT**

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Petitioner is Heroes Technology (US) LLC d/b/a Snuggle Me Organic.  Respondent is the Consumer Product Safety Commission (Commission).  There are no amici.

### B.    Order Under Review

Petitioner challenges a final rule issued by the Commission that establishes a mandatory safety standard for infant support cushions. 89 Fed. Reg. 87,467 (Nov. 4, 2024) (JA608).

### C.    Related Cases

This case has not previously been before this Court or any other court.  Counsel is not aware of any other related cases currently pending in this Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Michael Shih*
MICHAEL SHIH

## TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF JURISDICTION ............................................................. 1

PERTINENT STATUTES ..................................................................... 2

STATEMENT OF THE CASE .................................................................. 2

    A.    Statutory Background ............................................................ 2

    B.    The Challenged Rulemaking ................................................. 5

    C.    Prior Proceedings ................................................................. 8

SUMMARY OF ARGUMENT ................................................................. 9

STANDARD OF REVIEW ..................................................................... 11

ARGUMENT ......................................................................................... 12

THE PETITION FOR REVIEW SHOULD BE DENIED
BECAUSE THE MANDATORY SAFETY STANDARD FOR
INFANT SUPPORT CUSHIONS IS LAWFUL AND
REASONABLE .................................................................................... 12

    A.    The Mandatory Standard Is a Reasonable Exercise of
    the Commission's Authority to Regulate Durable Infant
    or Toddler Products. ........................................................... 12

    B.    Petitioner's Three Alternative Interpretations of the
    Term "Durable Infant or Toddler Product" Lack Merit. ...... 14

    C.    Petitioner's Policy and Technical Objections to the
    Standard Lack Merit. .......................................................... 27

CONCLUSION ...................................................................................... 32

ii

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*American Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
    896 F.3d 437 (D.C. Cir. 2018) .................................................... 2

*Borden v. United States,*
    593 U.S. 420 (2021) ............................................................... 16

*Burgess v. United States,*
    553 U.S. 124 (2008) .......................................................... 10, 24

*Cablevision Sys. Corp. v. FCC,*
    597 F.3d 1306 (D.C. Cir. 2010) ............................................. 27

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012) ............................................................... 24

*Delaware Dep't of Nat. Res. & Env't Control v. EPA,*
    895 F.3d 90 (D.C. Cir 2018) ................................................. 15

*Exxon Mobil Corp. v. Allapattah Servs., Inc.,*
    545 U.S. 546 (2005) ............................................................... 25

*Finnbin, LLC v. Consumer Prod. Safety Comm'n,*
    45 F.4th 127 (D.C. Cir. 2022) ......................................... 27, 29

*Food Mktg. Inst. v. Argus Leader Media,*
    588 U.S. 427 (2019) ............................................................... 16

*Groman v. Commissioner,*
    302 U.S. 82 (1937) ................................................................24

*Jam v. International Fin. Corp.,*
    586 U.S. 199 (2019) ............................................................... 12

*Long Island Power Auth. v. FERC,*
    27 F.4th 705 (D.C. Cir. 2022) ...............................................27

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ............................................................... 19

iv

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................ 11, 28

*Newman, Ex parte*,
   18 F. Cas. 94 (C.C.D.C. 1859)..........................................20

*South Coast Air Quality Mgmt. Dist. v. EPA*,
   472 F.3d 882 (D.C. Cir. 2006)..........................................15

*Southern Pac. Transp. Co. v. ICC*,
   69 F.3d 583 (D.C. Cir. 1995)............................................15

*Standard Terry Mills, Inc. v. Shen Mfg. Co.*,
   803 F.2d 778 (3d Cir. 1986) ............................................20

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) ......................................... 29

*United States v. Hansen*,
   599 U.S. 762 (2023) ...................................................... 20

**Statutes:**

Administrative Procedure Act (APA):
   5 U.S.C. § 553 ............................................................... 4
   5 U.S.C. § 706(2)(A) ..................................................... 11

Consumer Product Safety Act,
   Pub. L. No. 92-573, 86 Stat. 1207 (1972):
     § 2(b)(1), 86 Stat. at 1208................................................2
     § 4, 86 Stat. at 1210-1211 ..............................................2

Danny Keysar Child Product Safety Notification Act:
   15 U.S.C. § 2056a ................................................. 1, 9, 16
   15 U.S.C. § 2056a(b) ............................................... 1, 12
   15 U.S.C. § 2056a(b)(1)(B) .......................................... 4
   15 U.S.C. § 2056a(b)(3) ........................................... 1, 4
   15 U.S.C. § 2056a(d) ................................................. 14
   15 U.S.C. § 2056a(d)(1) ............................................... 4
   15 U.S.C. § 2056a(f)(1) ................................... 4, 10, 12, 24

15 U.S.C. § 2056a(f)(2) ...................................................... 4, 10, 24

15 U.S.C. § 2056a(f)(2)(A) ...................................................... 18, 26

15 U.S.C. § 2056a(f)(2)(B) ...................................................... 18, 26

15 U.S.C. § 2056a(f)(2)(F) ............................................... 17, 18, 26

15 U.S.C. § 2056a(f)(2)(H) ...................................................... 16, 26

15 U.S.C. § 2056a(f)(2)(K) ............................................................ 17

15 U.S.C. § 2056a(f)(2)(L) ............................................... 17, 18, 26

15 U.S.C. § 2056(a) ..................................................................... 2

15 U.S.C. § 2056(b)(1) ................................................................ 2

15 U.S.C. § 2058(b) ..................................................................... 3

15 U.S.C. § 2058(f)(3)(A) ............................................................ 3

15 U.S.C. § 2058(f)(3)(D) ............................................................ 3

15 U.S.C. § 2058(f)(3)(E) ............................................................ 3

15 U.S.C. § 2058(f)(3)(F) ............................................................ 3

15 U.S.C. § 2060(g)(2) ............................................................ 1, 4

15 U.S.C. § 2060(g)(3) ........................................................ 1, 5, 11

## Regulations:

16 C.F.R. pts. 1215-1239 ......................................................... 21

16 C.F.R. pts. 1241-1243 ......................................................... 21

## Legislative Materials:

153 Cong. Rec. 7701 (2007) ...................................................19

154 Cong. Rec. 3449 (2008) ...................................................19

H.R. Rep. No. 110-501 (2007)............................................19, 25

**Other Authorities:**

*Durable*, Merriam-Webster Online,
    https://perma.cc/F5K5-S7JD ............................................................. 12

74 Fed. Reg. 30,983 (June 29, 2009) .................................................. 22

74 Fed. Reg. 68,668 (Dec. 29, 2009) ................................................... 24

79 Fed. Reg. 17,422 (Mar. 28, 2014) .................................................. 17

82 Fed. Reg. 8,671 (Jan. 30, 2017) ...................................................... 17

87 Fed. Reg. 8,640 (Feb. 15, 2022) ......................................... 18, 24, 26

*Product*, Merriam-Webster Online,
    https://perma.cc/7DER-3GXZ ........................................................... 12

U.S. Consumer Prod. Safety Comm'n, *Briefing Package:*
    *CPSC Staff Response to the Record of Commission*
    *Action on Crib Bumpers* (Sept. 9, 2016),
    https://perma.cc/8742-2MW8 ............................................................ 22

# GLOSSARY

| | |
|---|---|
| Act | Danny Keysar Child Product Safety Notification Act, 15 U.S.C. § 2056a |
| APA | Administrative Procedure Act |
| ASTM | ASTM International |
| Commission | Consumer Product Safety Commission |

## STATEMENT OF JURISDICTION

The Danny Keysar Child Product Safety Notification Act, 15 U.S.C. § 2056a (Act), authorizes the Consumer Product Safety Commission (Commission) to issue mandatory safety standards for "durable infant or toddler products," *id*. § 2056a(b).  This case concerns a standard for infant support cushions that the Commission issued on November 4, 2024.  JA608-639.  On January 3, 2025, petitioner timely sought review.  Pet. for Review; *see* 15 U.S.C. §§ 2056a(b)(3), 2060(g)(2).  This Court has jurisdiction under 15 U.S.C. § 2060(g)(3).

## STATEMENT OF THE ISSUE

The Commission determined that infant support cushions are "durable infant or toddler products" because they are "not disposable," "have a useful life of up to several years," "are often used by multiple children successively," and "are resold and widely available on secondary marketplaces."  JA609.  Since 2010, such products have been involved in at least 79 infant deaths and at least 124 other incidents.  JA608.  The Commission therefore issued a final rule establishing a mandatory safety standard to govern infant support cushions.  The question presented is whether that standard is lawful and reasonable.

## PERTINENT STATUTES

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

Congress established the Consumer Product Safety Commission "to protect the public against unreasonable risks of injury associated with consumer products." Consumer Product Safety Act, Pub. L. No. 92-573, §§ 2(b)(1), 4, 86 Stat. 1207, 1208, 1210-1211 (1972). In the Consumer Product Safety Act, Congress gave the Commission general authority to issue safety standards for consumer products. 15 U.S.C. § 2056(a). This authority is, however, constrained. The Commission "shall rely upon voluntary consumer product safety standards," rather than issuing a mandatory standard, "whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed and it is likely that there will be substantial compliance with such voluntary standards." *Id.* § 2056(b)(1). Voluntary standards are developed by private organizations such as ASTM International (ASTM). *See American Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 441 (D.C. Cir. 2018).

2

The Commission cannot issue a mandatory standard pursuant to the Consumer Product Safety Act unless it finds that existing voluntary standards do not meet certain statutory criteria. 15 U.S.C. § 2058(f)(3)(D). The Commission must terminate consideration of a proposed mandatory standard if a sufficient voluntary standard is issued. *Id.* § 2058(b). The Commission also cannot issue a mandatory standard under this authority unless it finds that doing so "is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with" the product in question, "that the benefits expected from the [standard] bear a reasonable relationship to its costs," and that the standard "imposes the least burdensome requirement which prevents or adequately reduces the risk of injury for which [it] is being promulgated." *Id.* § 2058(f)(3)(A), (E), (F).

These limitations drew the attention of lawmakers concerned that the Commission lacked the means to ensure the safety of infant and toddler products. *See infra* pp. 19-20. Congress enacted the Danny Keysar Child Product Safety Notification Act in response to these concerns. The Act applies to "durable infant or toddler products," which it defines as "durable product[s] intended for use, or that may be

3

reasonably expected to be used, by children under the age of 5 years."
15 U.S.C. § 2056a(f)(1). The Act also identifies a nonexclusive list of
products that fall within this definition, which "includes" 12 specific
products: "full-size cribs and nonfull-size cribs"; "toddler beds"; "high
chairs, booster chairs, and hook-on chairs"; "bath seats"; "gates and
other enclosures"; "play yards"; "stationary activity centers"; "infant
carriers"; "strollers"; "walkers"; "swings"; and "bassinets and cradles."
*Id.* § 2056a(f)(2).

The Act directs the Commission to issue mandatory safety
standards for "durable infant or toddler products" "in accordance with"
the rulemaking procedures of the Administrative Procedure Act (APA)
within certain time periods. *See* 15 U.S.C. § 2056a(b) (incorporating 5
U.S.C. § 553). Furthermore, the Commission must "require each
manufacturer of a durable infant or toddler product" to comply with
various consumer-registration obligations "to improve the effectiveness
of manufacturer campaigns to recall such products." *Id.* § 2056a(d)(1).

"Any person adversely affected" by mandatory standards issued
under the Act may petition for review in this Court. 15 U.S.C.
§§ 2056a(b)(3), 2060(g)(2). The Court has "jurisdiction to review the

rule in accordance with" the APA "and to grant appropriate relief . . . as provided in such chapter." *Id.* § 2060(g)(3).

### B.    The Challenged Rule

**1.**    This petition concerns the Commission's mandatory safety standard for infant support cushions.  The Commission proposed the standard in 2024.  JA199.  The proposed rule defined an "infant support cushion" as "an infant product that is filled with or comprised of resilient material such as foam, fibrous batting, or granular material or with a gel, liquid, or gas, and which is marketed, designed, or intended to support an infant's weight or any portion of an infant while reclining or in a supine, prone, or recumbent position."  JA213.

The Commission identified "at least 79 reported fatalities involving infant support cushions" from 2010 to 2022.  JA199.  "In 2020 alone, there were 17 fatalities involving infant support cushions," and "[a]nother 17 fatalities [were] recorded in the potentially incomplete data for 2021," JA211—averaging to more than one death per month.  Over 80% of those deaths "involved infants three months old and younger."  JA199.  In over 60% of the deaths, "the official cause of death was either asphyxia or probable asphyxia, and these incidents typically

5

involved use of an infant support cushion" in conjunction with a "sleep-related consumer product such as an adult bed, futon, crib, bassinet, play yard, or . . . couch." JA199. The Commission also identified over 120 nonfatal incidents, including 22 that "consisted of emergency-department-treated injuries." JA201. Most nonfatal incidents involved "an infant falling from an infant support cushion placed on a raised surface . . . or the threat of asphyxia or entrapment." JA199.

The Commission acknowledged that ASTM had been "working toward a voluntary standard for infant loungers" since 2021. JA200 n.2, 204. Commission staff had requested the formation of ASTM's working group and had "actively participat[ed]" in ASTM proceedings. JA200 n.2. But by 2024, ASTM had still not issued any "voluntary . . . safety standard for infant support cushions." JA200. And ASTM's existing draft standard "would govern only a subset of the products covered by [the] proposed rule," JA204, and was insufficiently stringent, JA205-208. Accordingly, the Commission decided to propose a mandatory standard for infant support cushions that would address "suffocation, entrapment, and fall hazards." JA200. The Commission further proposed that infant support cushions be required to comply

6

with the product-registration requirements for durable infant or toddler products.  JA200.

Petitioner sells infant loungers that qualify as infant support cushions.  Petitioner participated in the rulemaking and expressly "support[ed]" the Commission's proposal to "add infant loungers to the list of durable infant products that must comply with" the Act's registration requirements.  JA427.  Petitioner objected to the proposed rule only on policy and technical grounds.  *See* JA428-431.

**2.**    The Commission issued its final rule in November 2024 after the Commissioners unanimously voted to publish it.  JA608, 609 n.5.  The preamble reaffirmed and expanded upon the Commission's initial analysis regarding fatal and nonfatal incidents.  JA611.[1]  The preamble also noted the continued absence of a voluntary standard for infant support cushions.  JA611.  The Commission therefore found that a mandatory standard was necessary "to address the risks of death and injury associated with infant suffocations, entrapments, and falls."  JA622.

---

[1] The Commission initially identified 125 nonfatal incidents, but one was found to be a duplicate before the final rule was issued.  JA611 n.12.

7

The final rule largely tracks the proposed rule. *See generally* JA609-610 (describing changes between proposed and final standards). The standard addresses "asphyxiation hazards by requiring that all surfaces be sufficiently firm that they are unlikely to conform to an infant's face and occlude the airways, and by setting a maximum incline angle" to "prevent hazardous positioning of an infant's head and neck." JA609 (footnote omitted).  The standard addresses "entrapment" hazards by requiring the angle between a "sidewall and the occupant support surface" to be greater than 90 degrees.  JA609; *see* JA635.  And the standard addresses "fall hazards by effectively limiting sidewall height to discourage caregivers from mistakenly believing these products to be safe for unsupervised infants."  JA609.  Additionally, the standard "requires a strongly worded, conspicuous, and permanent on-product warning label."  JA609.  Finally, the standard requires manufacturers to comply with the Act's consumer-registration requirements.  JA609.

## C.    Prior Proceedings

After petitioner sought review in this Court, petitioner asked the Court to stay the rule's effective date of May 5, 2025, pending review.

*See* JA625-626 (establishing effective date); Opposed Mot. for Stay

Pending Review, Mar. 13, 2025.  The Court denied the motion because

petitioner did not "satisf[y] the stringent requirements for a stay

pending court review."  Order, Apr. 18, 2025.

## SUMMARY OF ARGUMENT

**A.**    The petition for review should be denied because the

Commission's mandatory safety standard is both lawful and reasonable.

Infant support cushions are "durable infant or toddler products" subject

to the Danny Keysar Child Product Safety Notification Act, 15 U.S.C.

§ 2056a, because they are "not disposable," "have a useful life of up to

several years," "are often used by multiple children successively," and

"are resold and widely available on secondary marketplaces," JA609.

The mandatory safety standard is reasonably tailored to the hazards

posed by such products, which have been involved in at least 79 infant

deaths and at least 124 other incidents since 2010.  JA608.

**B.**    On review, petitioner contends that the Commission is

legally barred from regulating infant support cushions under the Act.

But petitioner waived any such challenge in notice-and-comment

proceedings, where it argued that the Commission could and should

9

regulate infant loungers under the Act.  JA427.  In any event, all three alternative interpretations proposed by petitioner lack merit.

Petitioner's principal theory is that, when Congress used the term "durable infant or toddler product," Congress meant to say "durable good," which petitioner interprets as a term of art that presumptively excludes textile products such as infant support cushions.  But the term "durable good" appears nowhere in the Act.  Indeed, the Act clarifies that the general definition of "durable infant or toddler product" includes certain textile products.

Alternatively, petitioner relies on portions of the Act's legislative history to argue that Congress might have intended to restrict the definition of "durable infant or toddler product" to the 12 product categories enumerated in 15 U.S.C. § 2056a(f)(2).  The Act unambiguously forecloses this interpretation as well.  The Act defines "durable infant or toddler product" in general terms.  *Id.* § 2056a(f)(1). The Act then explains, in a separate numbered paragraph, that the definition "includes" the examples at issue.  *Id.* § 2056a(f)(2).  The word "includes" is "a term of enlargement, and not of limitation."  *Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (quotations omitted).

10

Finally, petitioner argues that, at a minimum, the Commission was required to refer to the products listed in § 2056a(f)(2). This purported requirement also does not appear anywhere in the Act. In any event, the Commission did in fact refer to products on the statutory list.

**C.**    Petitioner also raises a variety of policy and technical objections to the Commission's standard. But the Commission specifically addressed each of petitioner's objections, and the Commission's conclusions are reasonable under any standard of review.

## STANDARD OF REVIEW

The Commission's mandatory safety standard may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see* 15 U.S.C. § 2060(g)(3). "The scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

11

## ARGUMENT

## THE PETITION FOR REVIEW SHOULD BE DENIED BECAUSE THE MANDATORY SAFETY STANDARD FOR INFANT SUPPORT CUSHIONS IS LAWFUL AND REASONABLE.

### A.  The Mandatory Standard Is a Reasonable Exercise of the Commission's Authority to Regulate Durable Infant or Toddler Products.

The Danny Keysar Child Product Safety Notification Act authorizes the Commission to regulate "durable infant or toddler product[s]."  15 U.S.C. § 2056a(b), (f)(1).  The Act defines that term as any "durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years."  *Id.* § 2056a(f)(1).  Although the Act does not separately define the term "durable product," courts "ordinarily assume, 'absent a clearly expressed legislative intention to the contrary,' that the 'legislative purpose is expressed by the ordinary meaning of the words used.'"  *Jam v. International Fin. Corp.*, 586 U.S. 199, 209 (2019).  In ordinary speech, the adjective "durable" means "able to exist for a long time without significant deterioration in quality or value."  *Durable*, Merriam-Webster Online, https://perma.cc/F5K5-S7JD.  The noun "product" means, in this context, "something produced."  *Product*, Merriam-Webster Online, https://perma.cc/7DER-3GXZ.  A "durable

12

product," therefore, is a product that is able to exist for a long time without significant deterioration in quality or value.

As the Commission explained, infant support cushions fall comfortably within this definition. The Commission found that such products are "not disposable," "have a useful life of up to several years," "are often used by multiple children successively," and "are resold and widely available on secondary marketplaces." JA609; *see* JA611 (describing listings for infant support cushions on online resale marketplaces). These findings confirm that infant support cushions are able to exist for a long time without significant deterioration in quality or value.

The Commission appropriately tailored the mandatory standard to the "risks of death and injury" that infant support cushions pose. JA622; *see* JA608 (finding that infant support cushions have been involved in at least 79 infant deaths and at least 124 other incidents since 2010). To address the risk of suffocation, the standard requires both a minimum firmness level and a maximum incline angle. JA609. To address the risk of entrapment, the standard imposes a "side angle requirement." JA609. To address the risk of falls, the standard

"limit[s] sidewall height to discourage caregivers from mistakenly believing these products to be safe for unsupervised infants."  JA609. Those requirements are both reasonable and reasonably explained.

**B.    Petitioner's Three Alternative Interpretations of the Term "Durable Infant or Toddler Product" Lack Merit.**

**1.**    On review, petitioner challenges the Commission's authority to regulate infant support cushions as "durable infant or toddler products" under the Act.  But petitioner waived this challenge during notice-and-comment proceedings.  One commenter in those proceedings questioned whether infant support cushions could be regulated as "durable infant or toddler products."  JA621.  Petitioner, however, "support[ed]" the opposite position.  JA427.  Petitioner expressly encouraged the Commission to "add infant loungers to the list of durable infant products that must comply with the [Act's] product registration requirements."  JA427; *see* 15 U.S.C. § 2056a(d) (establishing registration requirements for durable infant and toddler products).  That position is diametrically opposed to the position petitioner has taken here: that infant support cushions cannot be regulated under the Act at all.  Having previously urged the

14

Commission to exercise its authority to regulate infant support cushions under the Act, petitioner may not now switch positions simply because it does not like how that authority was exercised. *See Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 96 (D.C. Cir 2018) ("A petitioner may not 'take a position in this court opposite from that which it took below, particularly when its position has prevailed before the agency.'" (quoting *Southern Pac. Transp. Co. v. ICC*, 69 F.3d 583, 588 (D.C. Cir. 1995)); *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 892 (D.C. Cir. 2006) ("[C]ommenters may not reverse course after their preferred approach is adopted by the agency.").

    **2.**    In any event, all three of petitioner's alternative interpretations of the Act lack merit.

    **a.**    Petitioner's principal statutory theory assumes that, when Congress used the term "durable product," Congress meant to say "durable good." Br. 31-32. Petitioner defines "durable good" as an economic term of art that "presumptively" excludes "products like textiles and fabric items." Br. 33-35. Petitioner concludes that, because its product is made entirely from textiles, the product is not a "durable

good" and therefore not a "durable infant or toddler product" subject to the Act. Br. 35-36.

This interpretation is unambiguously foreclosed by the plain language of the Act. Begin with the statutory text. Even if the term "durable good" is a term of art that presumptively excludes all textile products, the Act never actually uses the term "durable good." *See generally* 15 U.S.C. § 2056a. The Act refers only to "durable product[s]." *Id.* And "[t]he first precondition of any term-of-art reading is that the term be present in the disputed statute." *Borden v. United States*, 593 U.S. 420, 435 (2021) (plurality opinion). Courts should not "imbue statutory terms with a specialized meaning when Congress hasn't itself invoked the . . . terms of art associated with that meaning." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 438 (2019). The Court should therefore reject petitioner's attempt to equate "durable product" with "durable good"—a term that "does not appear in the statute." *See id.*

The structure of the Act also undermines petitioner's interpretation. The Act defines "durable infant or toddler product" to include "infant carriers." 15 U.S.C. § 2056a(f)(2)(H). This category is

16

commonly understood to include both "sling carriers" and "soft infant carriers." 82 Fed. Reg. 8,671, 8,671 (Jan. 30, 2017) (reviewing ASTM standards and retailers' websites). Sling carriers and soft infant carriers are both textile products that would not qualify as "durable goods" as petitioner defines the term. *See id.* at 8672 (quoting ASTM definition of a "sling carrier" as "a product of fabric or sewn fabric construction"); 79 Fed. Reg. 17,422, 17,422 (Mar. 28, 2014) (quoting ASTM definition of a "soft infant and toddler carrier" as "a product[] normally of sewn fabric construction"). This demonstrates that Congress did not understand the term "durable infant or toddler product" to exclude textile products. Indeed, the Act goes on to define "durable infant or toddler product" to include products that can have major textile components. *E.g.*, 15 U.S.C. § 2056a(f)(2)(F) ("play yards"); *id.* § 2056a(f)(2)(K) ("swings"); *id.* § 2056a(f)(2)(L) ("bassinets and cradles"). That those products might likewise fail to satisfy petitioner's interpretation is an additional reason to reject it.

Construing "durable infant or toddler product" to exclude most if not all textile products would create other structural anomalies. The Act defines "durable infant or toddler products" to include "cribs,"

17

"toddler beds," and other products "used for infant sleep." 87 Fed. Reg. 8,640, 8,641 (Feb. 15, 2022); *see* 15 U.S.C. § 2056a(f)(2)(A), (B), (F), (L). These products are often used in conjunction with "crib mattresses." 87 Fed. Reg. at 8,641. The Commission "cannot fully address the risk of injury associated with" cribs and other sleep products without also "addressing the hazards associated with the use of crib mattresses." *Id.* The Commission has therefore issued a mandatory safety standard for crib mattresses under the Act—including mattresses made from stuffed fabric, *id.* at 8642, like many infant support cushions are, JA610.

Under petitioner's interpretation, however, it is not clear whether the Commission would have authority to issue a mandatory safety standard for crib mattresses under the Act. *See* Br. 38 (implying that such a standard would be illegal under petitioner's interpretation). Petitioner makes no attempt to explain why Congress would have wanted the Act to protect infants and toddlers from unsafe cribs but not from unsafe crib mattresses. And even if petitioner's interpretation leaves room to regulate crib mattresses in theory, such standards could presumably cover only mattresses that meet petitioner's term-of-art definition. For all other crib mattresses, the Commission would be

18

forced to proceed under its general—and comparatively more constrained—regulatory authority.  That result does not make sense, and it is not the best reading of the statute's plain language.  *Supra* pp. 16-17; *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

Finally, petitioner's interpretation is incompatible with the purposes of the Act, which was enacted because Congress did not think that the Commission's preexisting regulatory authorities were sufficiently protective of infants and toddlers.  *See* H.R. Rep. No. 110-501, at 21 (2007); *accord* 153 Cong. Rec. 7701 (2007) (statement of Rep. Schakowsky) (proposing to empower the Commission because "there are no mandatory safety standards for the majority of the children's products being sold today" and because, "although there may be voluntary standards in place, there are no requirements that all potential hazards are addressed in those standards"); 154 Cong. Rec. 3449 (2008) (statement of Sen. Klobuchar) ("Right now the safety of the Nation's nursery products depends on a system of voluntary standards. And while voluntary standards are a good first step, we have seen over and over again that they are not enough.").  Nothing in the Act suggests

that Congress wanted the Commission's ability to protect infants and
toddlers to turn on the percentage of textiles in a product.

To bridge the gap between what Congress said and what
petitioner would like Congress to have said, petitioner argues (Br. 31-
34) that the word "durable" could be read to incorporate the term of art
"durable goods" and its presumptive exclusion of textile products.  Even
if that is a plausible definition of "durable" in some circumstances, there
is no dispute that "durable" also has an ordinary meaning that is
broader than petitioner's term-of-art understanding.  "Durable" simply
means "able to exist for a long time without significant deterioration in
quality or value."  *See supra* p. 12; *accord* Br. 30 (citing similar
definitions).  This ordinary meaning does not presumptively exclude
textiles; indeed, "durable" has long been used to describe fabrics and
textiles.  *E.g.*, *Ex parte Newman*, 18 F. Cas. 94, 95 (C.C.D.C. 1859) (No.
10,173); *Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 779
n.2, 781 (3d Cir. 1986).  "When words have several plausible definitions,
context differentiates among them. . . .  Statutory history is an
important part of this context."  *United States v. Hansen*, 599 U.S. 762,
775 (2023).  Here, context and history make clear that Congress

20

intended the ordinary definition, not petitioner's preferred term-of-art definition, to control.

Petitioner also argues (Br. 36-38) that, if the term "durable infant or toddler product" is given its ordinary meaning, the Act will "ha[ve] no limits." But Congress's decision to define the term without reference to petitioner's preferred limit—a presumptive exclusion of textile products—does not mean that the definition has no limits at all. The Commission must still find that a given product is "durable" as that word is ordinarily understood. *See* JA609, JA621 (making specific findings regarding infant support cushions). Many common infant and toddler products, including all disposable products, would not qualify as "durable" under that ordinary understanding. Nor has the Commission treated the Act as a blank check to regulate the entire universe of infant or toddler products. To our knowledge, the Commission has issued 28 mandatory standards under the Act. 16 C.F.R. pts. 1215-1239, 1241-1243.

Petitioner emphasizes (Br. 39-40) that the Commission sometimes examines whether a product is a "durable good" to determine if it is also a "durable infant or toddler product." That misunderstands the

21

Commission's reasoning.  The economic definition of "durable goods"
provides "some guidance" on what qualifies as a "durable infant or
toddler product."  74 Fed. Reg. 30,983, 30,984 (June 29, 2009).  But the
Commission has never said that the two terms are synonymous as a
matter of law.  Rather, the Commission has made clear that
"[a]dditional guidance comes from considering the product examples" in
the Act's definition of "durable infant or toddler product."  *Id.*  Those
examples include products made entirely from textiles.  *See supra* pp.
16-17; *accord* U.S. Consumer Prod. Safety Comm'n, *Briefing Package:
CPSC Staff Response to the Record of Commission Action on Crib
Bumpers* 29 (Sept. 9, 2016), https://perma.cc/8742-2MW8 (expressing
view of Commission staff that "the Commission is not limited to the
economic definition . . . when determining whether" a product is "a
'durable infant or toddler product' . . . .").

     Petitioner could not prevail even if the Court were to assume that
the Act presumptively excludes textile products.  Petitioner itself
suggests (Br. 36) that any such presumption can be overcome with a
showing that a product "[is] used repeatedly over long periods of time
without degrading."  But the Commission specifically found that infant

support cushions are "not disposable," "have a useful life of up to several years," "are often used by multiple children successively," and "are resold and widely available on secondary marketplaces." JA609; *see also* JA621 (similar). Those findings are more than enough to rebut any applicable presumption. Significantly, petitioner never disputes that its infant support cushions can be used repeatedly over long periods of time without degrading. Petitioner simply states (Br. 35) that its cushions are "machine washable" and "are intended for use for infants up to 1 year old." Those representations do not undermine the Commission's durability findings.

**b.** With its principal interpretation unavailing, petitioner proposes (Br. 43) an alternative: that "Congress may have intended § 2056a(f)(2)'s list [of 12 examples] to be a finite set of products" subject to regulation under the Act. This fallback interpretation is also unambiguously foreclosed by the plain language of the Act.

The Act does not define "durable infant or toddler product" exclusively by reference to the 12 example product categories it lists. The Act sets forth a general definition that covers any "durable product intended for use, or that may be reasonably expected to be used, by

23

children under the age of 5 years." 15 U.S.C. § 2056a(f)(1). The Act

then specifies, in a separate numbered paragraph, that the term

"includes" the examples at issue. *Id.* § 2056a(f)(2).

As the Supreme Court has recognized, the word "includes" is

"usually a term of enlargement, and not of limitation." *Burgess v.*

*United States*, 553 U.S. 124, 131 n.3 (2008) (internal quotation marks

omitted); *see Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142,

162 (2012) (holding that the "verb 'includes' . . . makes clear that the

examples enumerated in the text are intended to be illustrative, not

exhaustive"). "'[W]hen an exclusive definition is intended [by

Congress,] the word "means" is employed'" instead. *Burgess*, 553 U.S.

at 131 n.3 (quoting *Groman v. Commissioner*, 302 U.S. 82, 86 (1937)

(first alteration in original)). Accordingly, the Commission long ago

concluded that, "[b]ecause the statute has a broad definition of a

durable infant or toddler product . . . , additional items" beyond the "12

specific product categories" "can and should be included in the

definition." 74 Fed. Reg. 68,668, 68,669 (Dec. 29, 2009); *see* 87 Fed. Reg.

at 8,641 (establishing a mandatory safety standard for crib mattresses,

which are "not included in the statutory list"). Accepting petitioner's

24

contrary interpretation would ignore Congress's use of the word "includes" in § 2056a(f)(2), would nullify the general definition Congress enacted in § 2056a(f)(1), and would undermine the Commission's ability to protect infants and toddlers under the Act.

Petitioner does not attempt to justify this alternative interpretation by reference to the Act's text or structure. Petitioner relies solely on the Act's legislative history. *See generally* Br. 43-44. But as petitioner acknowledges, "[l]egislative history plays no role in interpreting an unambiguous statute." Br. 43; *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (reaffirming that "[Congress's] authoritative statement is the statutory text, not the legislative history"). Moreover, even petitioner's cited sources do not conclusively support its position. *E.g.*, H.R. Rep. No. 110-501, at 34 (explaining that the Act defines "durable infant or toddler product" in general terms and that the general definition "specifically applies to 12 enumerated products").

**c.** Finally, petitioner argues (Br. 41) that, at a minimum, the Act must be interpreted to require the Commission to "reference [the] statutory product list for guidance." This purported requirement does

25

not appear in the Act.  Nor did the Commission impose this requirement upon itself in prior rulemakings, as petitioner mistakenly suggests (Br. 41-42, 47-49).

In any event, petitioner could not prevail even under this interpretation because the Commission did refer to the statutory product list for guidance.  For example, the Commission compared infant support cushions to "sling carriers," JA609, which are a type of infant carrier, *see supra* p. 17.  "[I]nfant carriers" are on the statutory list.  15 U.S.C. § 2056a(f)(2)(H).  The list also includes several products "used for infant sleep."  87 Fed. Reg. at 8,641; *see* 15 U.S.C. § 2056a(f)(2)(A) (cribs), (B) (toddler beds), (F) (play yards), (L) (bassinets and cradles).  As the preamble to the final rule makes clear, infant support cushions are similar to those products because "caregivers use [them] . . . in infant sleep settings" despite the fact that such cushions are not "intended for sleep."  JA612; *see* JA613 (observing that "infants sleep for a majority of the day and tend to fall asleep in products intended for lounging.").  Furthermore, the Commission found that infant support cushions can be used in conjunction with listed sleep

26

products, JA613, and that many infant deaths involved infant support

cushions placed "in or on" a listed sleep product, JA608.

### C. Petitioner's Policy and Technical Objections to the Standard Lack Merit.

Petitioner also contends that the mandatory standard is arbitrary

or capricious for a litany of policy and technical reasons. But the Court

should accord due respect to the Commission's "expert policy

judgment[s]" in this "technical, complex, and dynamic" field. *Cf.*

*Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1311 (D.C. Cir. 2010).

And the Commission's conclusions were reasonable and reasonably

explained under any standard of review.

First, petitioner argues (Br. 49-50) that the Commission's

definition of "infant support cushion" is overbroad. But when

"formulating general rules, 'a regulator need not always carve out

exceptions for arguably distinct subcategories of projects.'" *Finnbin,*

*LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 135 (D.C. Cir.

2022) (quoting *Long Island Power Auth. v. FERC*, 27 F.4th 705, 715

(D.C. Cir. 2022)). Here, the Commission explained that, because "all

types of infant support cushions" present "similar" hazards, they should

all be regulated similarly. JA612. In particular, the Commission found

27

that "caregivers use infant support cushions, which are not intended for sleep, in infant sleep settings" and that "infants tend to fall asleep in" such products. JA612. Indeed, during notice-and-comment proceedings, petitioner acknowledged that such alleged "misuse" of its infant loungers "played a major role" in the "reported injury incidents" involving them. JA445; *see* JA433. It was therefore reasonable for the Commission to develop a "comprehensive[]" standard "to mitigate the[se] hazards." JA612.

Second, petitioner argues (Br. 50-52, 57) that the Commission should have accounted for "risk reduction" resulting from a different rule establishing safety standards for infant sleep products. But that is not "an important aspect of the problem" addressed by this rule, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), because the definition of "infant support cushion" excludes "sleeping accommodations that are regulated under" the infant sleep products rule, JA610. Moreover, the Commission reasonably determined that infant support cushions present hazards independent of those presented by infant sleep products. JA609; *see generally*

JA102-108 (analyzing reported deaths and nonfatal incidents associated with infant support cushions); JA110-117 (describing hazard patterns).

Third, petitioner argues (Br. 53) that the Commission did not consider whether the rule might cause "parents and caregivers to adopt regrettable substitutions." But the Commission expressly considered and rejected that concern as speculative because "[n]one of the commenters provide[d] data to support" it. JA615. Nevertheless, to mitigate any such risk, the rule requires infant support cushions to be accompanied by warnings about soft bedding and other soft surfaces. JA615, JA618. The Commission strengthened the language of those warnings at petitioner's recommendation. JA620.

Fourth, petitioner argues (Br. 53-55) that the Commission should have done more studies and generated more data. But the Administrative Procedure Act requires only a "reasoned explanation," not a specific quantum of "empirical evidence." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). And Congress empowered the Commission to issue standards under the Act without first undertaking a "rigorous cost-benefit analysis." *Finnbin, LLC*, 45 F.4th at 135. In any event, the Commission based the rule on extensive

29

empirical research.  *See generally* JA101-160 (summarizing the rule's factual and scientific bases).  The Commission explained that it was not undertaking the additional studies demanded by petitioner because they were unnecessary and "could take years to complete while injuries and deaths continue to occur."  JA616.

Fifth, petitioner argues (Br. 53-55) that, because the rule functionally limits infant support cushions' sidewalls to a height of "less than 2 inches," JA618, the rule might increase the risk of falls.  But as the Commission found, "the incident data show that higher sidewall heights do not adequately contain infants or prevent falls."  JA618; *see generally* JA129-138, 143-145 (describing Commission's empirical studies of sidewall issues).  By contrast, higher sidewalls "give the false perception to the caregiver that the product will safely contain their infant."  JA618; *see generally* JA147-160 (describing Commission's research into "relevant use patterns" and other "human factors").  Because higher sidewalls do not meaningfully reduce the risk of falls and may in fact increase it, and because higher sidewalls pose an increased risk of asphyxiation, the Commission's limitation on sidewall

height is reasonable.  Significantly, the American Academy of Pediatrics submitted a comment "strongly support[ing]" that limitation.  JA236.

Sixth, petitioner argues (Br. 55-57) that the rule's 180-day effective date does not give regulated entities enough time to come into compliance.  But as the Commission observed, "juvenile product manufacturers are accustomed to adjusting to new standards within" a 6-month timeframe.  JA621.  This is the same timeframe that is "typically allow[ed] . . . for products . . . to implement a new voluntary standard."  JA621.  And the record contained only general assertions that a longer-than-usual compliance period was necessary.  JA621.  The Commission further concluded that any hypothetical compliance concerns were outweighed by the fact that at least 79 infants had died in incidents involving infant support cushions from 2010 through 2022, and that such cushions were involved in at least 124 more incidents that did not result in death.  JA608, 621.  Given the "urgency" of addressing "continued infant injuries and deaths," the Commission reasonably determined that the usual six-month effective date was appropriate.  JA621.

31

Finally, petitioner argues (Br. 57) that the Commission relied on stale incident data. But as the Commission explained, "fatality data reported to the [Commission] is not considered complete until three years later." JA608 n.1. The most recent complete available data confirmed "multiple deaths each year associated with" infant support cushions, including "at least 17 in 2022." JA621.

## CONCLUSION

For these reasons, the petition for review should be denied.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CHARLES W. SCARBOROUGH

 */s/ Michael Shih*

MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*
  *michael.shih@usdoj.gov*

September 2025

32

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,789 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.


*/s/ Michael Shih*
MICHAEL SHIH

**ADDENDUM**

# TABLE OF CONTENTS

15 U.S.C. § 2056a ........................................................................ A1

15 U.S.C. § 2056a

## § 2056a. Standards and consumer registration of durable nursery products

. . .

**(b) Safety standards**

**(1) In general**

The Commission shall—

**(A)** in consultation with representatives of consumer groups, juvenile product manufacturers, and independent child product engineers and experts, examine and assess the effectiveness of any voluntary consumer product safety standards for durable infant or toddler products; and

**(B)** in accordance with section 553 of Title 5, promulgate consumer product safety standards that—

**(i)** are substantially the same as such voluntary standards; or

**(ii)** are more stringent than such voluntary standards, if the Commission determines that more stringent standards would further reduce the risk of injury associated with such products.

**(2) Timetable for rulemaking**

Not later than 1 year after August 14, 2008, the Commission shall commence the rulemaking required under paragraph (1) and shall promulgate standards for no fewer than 2 categories of durable infant or toddler products every 6 months thereafter, beginning with the product categories that the Commission determines to be of highest priority, until the Commission has promulgated standards for all such product categories. Thereafter, the Commission shall periodically review and revise the standards set forth under this subsection to ensure that such standards provide the highest level of safety for such products that is feasible.

A1

**(3) Judicial review**

Any person adversely affected by such standards may file a petition for review under the procedures set forth in section 2060(g) of this title, as added by section 236 of this Act.

. . .

**(d) Consumer registration requirement**

**(1) Rulemaking**

Notwithstanding any provision of chapter 6 of Title 5 or the Paperwork Reduction Act of 1980 (44 U.S.C. 3501 et seq.), not later than 1 year after August 14, 2008, the Commission shall, pursuant to its authority under section 2065(b) of this title, promulgate a final consumer product safety rule to require each manufacturer of a durable infant or toddler product—

**(A)** to provide consumers with a postage-paid consumer registration form with each such product;

**(B)** to maintain a record of the names, addresses, e-mail addresses, and other contact information of consumers who register their ownership of such products with the manufacturer in order to improve the effectiveness of manufacturer campaigns to recall such products; and

**(C)** to permanently place the manufacturer name and contact information, model name and number, and the date of manufacture on each durable infant or toddler product.

**(2) Requirements for registration form**

The registration form required to be provided to consumers under paragraph (1) shall—

**(A)** include spaces for a consumer to provide the consumer's name, address, telephone number, and e-mail address;

**(B)** include space sufficiently large to permit easy, legible recording of all desired information;

A2

**(C)** be attached to the surface of each durable infant or toddler product so that, as a practical matter, the consumer must notice and handle the form after purchasing the product;

**(D)** include the manufacturer's name, model name and number for the product, and the date of manufacture;

**(E)** include a message explaining the purpose of the registration and designed to encourage consumers to complete the registration;

**(F)** include an option for consumers to register through the Internet; and

**(G)** include a statement that information provided by the consumer shall not be used for any purpose other than to facilitate a recall of or safety alert regarding that product.

In issuing regulations under this section, the Commission may prescribe the exact text and format of the required registration form.

. . .

**(f) Definition of durable infant or toddler product**

As used in this section, the term "durable infant or toddler product"—

**(1)** means a durable product intended for use, or that may be reasonably expected to be used, by children under the age of 5 years; and

**(2)** includes—

**(A)** full-size cribs and nonfull-size cribs;

**(B)** toddler beds;

**(C)** high chairs, booster chairs, and hook-on chairs;

**(D)** bath seats;

**(E)** gates and other enclosures for confining a child;

**(F)** play yards;

A3

**(G)** stationary activity centers;

**(H)** infant carriers;

**(I)** strollers;

**(J)** walkers;

**(K)** swings; and

**(L)** bassinets and cradles.